IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

MICHELLE MARIA PAXSON,       )
                                     )
       Plaintiff,         )
                                     )
     v.                  )      Case No.
                                     )      12-6026-CV-SJ-REL-SSA
CAROLYN W. COLVIN, Acting     )
Commissioner of Social Security,     )
                                   )
       Defendant.       )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Michelle Paxson seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to show a nexus between the evidence and the residual functional capacity and failing to assess the weight given to each medical opinion, and (2) conducting a faulty credibility analysis and ignoring plaintiff's alleged mental limitations and side effects from medication. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On November 10, 2008, plaintiff applied for disability benefits alleging that she had been disabled since February 1, 2008. Plaintiff's disability stems from multiple sclerosis, obesity, major depressive disorder, and panic disorder. Plaintiff's application was denied initially. On October 14, 2010, a hearing was held before an Administrative Law Judge. On March 24, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On January 19, 2012, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff and vocational expert Dr. Jerry Beltramo, in addition to documentary evidence admitted at the hearing.

### A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

| | |
|---|---:|
| 1988 Total | $ 595.03 |
| 1989 Total | 0.00 |
| 1990 Total | 0.00 |
| 1991 Total | 1,165.50 |
| 1992 Total | 355.29 |
| 1993 Total | 1,424.19 |

| | |
|---|---:|
| Ameri-Sort | 82.11 |
| Sholand | 117.34 |
| 1994 Total | 199.45 |

| | |
|---|---:|
| Godfathers Pizza | 1,584.67 |
| Wiedmaier Truck Stop | 19.68 |
| Taco Bell | 102.56 |
| Miners Enterprises | 550.65 |
| Allie's Restaurant | 896.74 |
| Burger King | 553.23 |
| 1995 Total | 3,707.53 |

| | |
|---|---:|
| Godfathers Pizza | 867.36 |
| Saxtons Nursing & Boarding Homes | 3,683.84 |
| Sparkle-Brite Cleaning Service | 1,939.52 |
| 1996 Total | 6,490.72 |

| | |
|---|---:|
| Saxtons Nursing & Boarding Homes | 2,387.08 |
| Joyce Ozenberger | 3,607.65 |
| Restaurant Concepts[1] | 1,677.46 |

---

[1]This is most likely a restaurant as the earnings include tips.

4

|  |  |
|---|---:|
| Perkins Restaurant | 74.67 |
| 1997 Total | 7,746.86 |
| | |
| Aramark Food & Support Services | 3,002.18 |
| Beverly Manor, Inc. | 3,889.56 |
| R-J Foods, Inc. | 897.00 |
| 1998 Total | 7,788.74 |
| | |
| Saxtons Nursing & Boarding Homes | 1,864.50 |
| 1999 Total | 1,864.50 |
| | |
| RNR, Inc.[2] | 1,271.55 |
| Saxtons Nursing & Boarding Homes | 996.94 |
| Carlos O'Kelly's Inc.[3] | 824.86 |
| Renal Management, Inc. | 1,737.99 |
| 2000 Total | 4,831.34 |
| | |
| Carlos O'Kelly's Inc. | 192.69 |
| Customers 1st, Inc. | 129.64 |
| Interfaith Community Services, Inc. | 117.25 |
| 2001 Total | 439.58 |
| | |
| P&J Enterprises of St. Joseph | 149.50 |
| 2002 Total | 149.50 |
| | |
| Bold Ventures, LLC | 195.40 |
| Kelly Services, Inc. | 219.38 |
| Senior Life, Inc. | 985.04 |
| 2003 Total | 1,399.82 |
| | |
| Sodexo Management, Inc. | 1,953.90 |
| Taco Bandido | 1,662.33 |
| Staffing Center, Inc. | 4,148.27 |
| Ryan's Restaurant | 299.86 |
| 2004 Total | 8,064.36 |
| | |
| Sodexo Management, Inc. | 2,026.80 |
| IMKO Staffing | 332.25 |
| Roger E. Vanover | 2,617.34 |
| Citadel Holdings, LLC | 68.75 |
| Papa Joe's Restaurant | 275.17 |
| 2005 Total | 5,320.31 |

---

[2]This is most likely a restaurant as the earnings include tips.

[3]This is most likely a restaurant as the earnings include tips.

Case 5:12-cv-06026-REL   Document 17   Filed 08/19/13   Page 5 of 55

|  |  |  |
|---|---|---|
| James P. Hawkins, Inc. | | 48.75 |
| Sound Investment Corporation | | 287.95 |
| Jamis, LLC[4] | | 456.96 |
| DDS & I, Inc. | | 1,221.73 |
| SDI of Frederick Street | | 197.49 |
| 2006 Total | | 2,212.49 |
| James P. Hawkins, Inc. | | 52.00 |
| Sound Investment Corporation | | 1,425.61 |
| 2007 Total | | 1,477.61 |
| H&R Block | | 537.46 |
| 2008 Total | | 537.46 |
| 2009 Total | | 0.00 |
| 2010 Total | | 0.00 |

(Tr. at 185-192).

### Disability Report - Field Office

In a face-to-face interview with plaintiff, C. Arnold observed that plaintiff had no difficulty hearing, reading, breathing, understanding, coherency, concentrating, talking, sitting, standing, walking, seeing, using her hands or writing (Tr. at 197). She did have trouble answering questions -- "seemed kind of laid back, not very outgoing." (Tr. at 197).

### Disability Report - Adult

In an undated Disability Report, plaintiff said she has a medical assistance card (Tr. at 199-207). Plaintiff said she is unable to work because "My MS [multiple sclerosis] has gotten really bad and it has made me really depressed and I am embarrassed to go out in public, and I am in pain and have problems with balance."

### B.  SUMMARY OF TESTIMONY

During the October 14, 2010, hearing, plaintiff testified; and Dr. Jerry Beltramo, a vocational expert, testified at the request of the ALJ. During the hearing, the ALJ found that

---

[4]This is most likely a restaurant as the earnings include tips.

plaintiff's last insured date was June 30, 2008 (Tr. at 38). He also read into the record a notice plaintiff had received from SSA: "The medical evidence shows additional information was needed to evaluate the severity of your condition. We asked you to provide additional information regarding your daily activities, but you failed to submit this report. Our efforts to obtain your cooperation were unsuccessful. Therefore, benefits are denied." (Tr. at 39).

1.    **Plaintiff's testimony.**

At the time of the hearing plaintiff was 36 years of age (Tr. at 37). She has a GED (Tr. at 37). She had just completed a semester of college at Missouri Western (Tr. at 37). She is left handed, she is about 5'4" tall and weighs about 180 pounds, although she lost about 70 pounds over the last year and a half (Tr. at 37, 43-44). She believes her weight loss is due to multiple sclerosis and depression (Tr. at 44). She goes two or three days without eating anything, and then she binges (Tr. at 44). Plaintiff lives in St. Joseph with her two children (Tr. at 36). She is not married, and she does not "have anybody." (Tr. at 83). Plaintiff has no income, but her son gets a "death benefit." (Tr. at 42-43).

Plaintiff does not use a cane at this time, but in the past she did (Tr. at 44). Plaintiff was diagnosed with multiple sclerosis in October 2007 (Tr. at 44). Plaintiff originally sought medical attention because she lost the hearing in her right ear and then the left side of her face and upper body was numb and tingly all the time (Tr. at 44-45, 78). Now plaintiff's MS causes her to have continued hearing loss in her right ear and constant numbness and tingling on the left side of her face and upper body (Tr. at 45, 78). Plaintiff was able to hear the ALJ during the hearing (Tr. at 79) and she does not use a hearing aid (Tr. at 79). Plaintiff still has tingling in her face (Tr. at 79). She has pain in her neck and left shoulder area (Tr. at 45).

Plaintiff's MS flares up about twice a month (Tr. at 73). During a flare-up the numbness and tingling gets so intense that "it feels weird to take a shower." (Tr. at 73). She

feels like needles are poking her everywhere (Tr. at 73). This only happens on her left side, not her right side (Tr. at 73). Sometimes it goes from head to toe; but usually it is just the left side of her head, her neck, and down through her arm (Tr. at 73-74). A flare-up lasts a couple of days (Tr. at 74).

Plaintiff was asked how she functions the other approximately 28 days a month when she is not having a flare-up (Tr. at 74). She said, "I'm not as good as I feel like I should be for 36." (Tr. at 74). She still always has the numbness and tingling, just not as bad (Tr. at 74). When asked if she is functional, plaintiff said, "Not really" (Tr. at 74). When asked to explain, plaintiff said her sister still helps with housework and going to the grocery store (Tr. at 74-75).

Plaintiff sees a doctor twice a year for her MS (Tr. at 45-46). They just see how she is doing because there is not a lot that can be done for her (Tr. at 46). She takes a daily injection of Copaxone which is for the lesions on her brain -- it does not stop them but it controls them and keeps them from getting worse (Tr. at 46, 75). The Copaxone causes plaintiff to suffer pain, plum- to orange-sized knots at the injection site, fatigue and nausea (Tr. at 46). She gets short of breath and has to lie down for about a half hour as soon as she administers the shot (Tr. at 46). She began using the Copaxone about three years before the hearing (Tr. at 46). The knots take a week or longer to resolve -- plaintiff gives herself the shot in a different place every day (Tr. at 47).

After giving herself the shot, plaintiff's pain is rated as an 8/10 (Tr. at 47). She was asked whether the pain level goes down after that, and she said, "Not till it goes away." (Tr. at 47). Plaintiff only takes over-the-counter pain medicine like Aleve (Tr. at 47). Plaintiff's doctor said she is too young to take medication (Tr. at 47-48). Her doctor recommended she go to a pain center, but she has not done that (Tr. at 48). Plaintiff also takes Prednisone as needed for the numbness and tingling "when it's real bad" (Tr. at 48). The numbness and

8

tingling never goes away completely (Tr. at 49). She does not have any side effects from Prednisone (Tr. at 48).

Things look bubbly or bouncy to her because of medication (Tr. at 48). Sometimes it is like this for an entire day, sometimes it will not occur for two or three months (Tr. at 48-49).

On plaintiff's bad days, she does not get out of bed the entire day due to pain and feeling unbalanced (Tr. at 49).

Plaintiff does not have a lot of medical records because she does not want to be on a lot of medication (Tr. at 49-50). Her neurologist told her there is not a lot that can be done for her other than medication (Tr. at 50). Her MS will get progressively worse (Tr. at 50).

Plaintiff has been treated for depression and anxiety for about 15 years, or since she was about 21 years of age (Tr. at 50, 69). Plaintiff was treated at Family Guidance Center beginning in 1998 or 1989 (Tr. at 50). If she suffers from depression and anxiety at the same time, she does not like to leave her house (Tr. at 51). When asked how often that happens, plaintiff said, "It never not happens." (Tr. at 51). Plaintiff does not want to be around anyone (Tr. at 51). Plaintiff might go to the store for milk or a loaf of bread, but "if it's actual shopping, I can't handle it." (Tr. at 51, 82). Plaintiff suffers from crying spells every day but they do not last very long (Tr. at 51). Plaintiff's records from Family Guidance Center indicate she was doing okay, but her situation has gotten worse since then (Tr. at 52). Her anxiety is a lot worse because she worries and is upset all the time (Tr. at 52). She goes to bed at 2:00 a.m. and she gets up at 7:00 a.m. (Tr. at 52). She does not sleep that entire five hours because her mind races (Tr. at 52). Plaintiff is not getting counseling because she feels like people do not care (Tr. at 52). She tried to go to counseling but she felt like it was not going to help her (Tr. at 52-53). She has never actually seen a counselor (Tr. at 53). A psychiatrist has prescribed medication for her (Tr. at 53). Plaintiff is currently taking 225 mg of Effexor XR (treats

9

anxiety and depression) which is helping (Tr. at 53).

Later, on questioning by the ALJ, plaintiff testified that she saw a psychiatrist from 2008 until the beginning of 2010 and stopped because they wanted her to get a case manager who comes to her house and she did not want to do that (Tr. at 69).  She did not want anyone coming to her house (Tr. at 69).  "I've been taking Effexor for 12, 13 years, and I don't feel like I need to be monitored on my medication.  I mean that's what it is." (Tr. at 83).  She still takes the Effexor XL even though she is not seeing a mental health professional (Tr. at 69-70).  Her primary care physician prescribes it (Tr. at 70).

Plaintiff sleeps during the day three or four times a week (Tr. at 54).  When she does, she sleeps for three or four hours (Tr. at 54).  Plaintiff takes her three-year-old daughter to day care and her son is at school, so she feels like she can sleep (Tr. at 54).

Plaintiff's hands are OK but her arms hurt all the time from the painful injection sites (Tr. at 54).  She does not know how much weight she can lift, but she cannot pick up her daughter and she cannot take out the trash (Tr. at 54).  She can lift a gallon of milk but cannot pour it (Tr. at 54).  She can pick things up better with her right hand than her left hand, even though she is left-handed (Tr. at 55).  Later she testified that she could lift 10 to 15 pounds (Tr. at 81).  She could not do that repetitively, however, and she would need to rest after lifting that much (Tr. at 84).  Plaintiff's three-year-old daughter wants to be held all the time, and plaintiff cannot do it (Tr. at 84).  Her daughter weighs 44 pounds (Tr. at 85).

Plaintiff's muscles in her upper legs hurt all the time because of getting shots in her legs (Tr. at 55-56).  There are only 8 injection sites she can use, but she actually only uses 4 because she gets boils when she uses the other four (Tr. at 56, 75).  She can give herself shots in either arm or either leg, on the left or right side of her stomach, and the left or right side of her back (in which case someone else would have to administer the shot) (Tr. at 75).  Plaintiff

10

only gives herself shots in her legs or her arms (Tr. at 76). Plaintiff gives herself the shots before bedtime -- when she did it in the morning she had difficulty with shortness of breath and nausea (Tr. at 56, 76). The nausea lasts anywhere from 30 to 60 minutes (Tr. at 56, 77). The injection site becomes swollen and painful, and that lasts for a week or longer (Tr. at 76). Therefore, because she gets a shot every day, she is always swollen and in pain (Tr. at 76).

Being active -- such as coming to her administrative hearing -- makes plaintiff's injection sites worse because any movement causes worse pain (Tr. at 56-57). Plaintiff can only walk "maybe a half a block" due to pain (Tr. at 57).

Plaintiff first testified that her pain does not interfere with her concentration (Tr. at 57). Then she changed her testimony and said it does (Tr. at 57). However, when she was asked about that again, she testified that the lack of concentration is actually due to her mind constantly racing (Tr. at 57-58). When asked to describe how her mind races, plaintiff said she just feels like she needs to be doing something all the time (Tr. at 58).

Besides using Aleve, plaintiff takes hot baths to relieve her pain (Tr. at 58). After 24 hours, she can rub the injection site, so she does that (Tr. at 58).

Plaintiff last worked "outside the home" in March 2007 (Tr. at 58). She was a cashier at Arby's and worked there 7 or 8 months (Tr. at 58). She left that job because of her anxiety -- "I just don't want to be around people" (Tr. at 59). Plaintiff was not fired, she quit (Tr. at 59). Before Arby's plaintiff worked as a computer tech at Albaugh Chemical Plant for about 9 months (Tr. at 59). She just watched a computer screen (Tr. at 59). She quit that job because she was worried about being exposed to chemicals (Tr. at 59). Before that, plaintiff worked at Taco Bandito as a cashier (Tr. at 60). Plaintiff worked at nursing homes, which she "absolutely loved doing." (Tr. at 60). She did that off and on for about six years (Tr. at 60). She was a nurses assistant but did not get certified (Tr. at 60). Her jobs were "off and on" because she

11

would have bouts when she felt like she could not leave her house (Tr. at 60). Because her employer could not tolerate plaintiff's absences, she had to quit (Tr. at 60-61). When she started feeling better, she would get rehired, but after a few months to a year, she would have to miss work again and quit (Tr. at 61).

Plaintiff worked as a dialysis technician for about 8 months (Tr. at 61). She left that job because she was afraid she would get too emotionally attached to the patients and then they would die (Tr. at 61).

Plaintiff was hospitalized in 2001 or 2002 due to anxiety (Tr. at 61). It was so bad she could not swallow, could not sleep, could not eat, and "probably" had a lot of thoughts of suicide at the time (Tr. at 61). She was in the hospital for three weeks (Tr. at 62). She has not been in the hospital since then for an emotional condition, but she did go to the emergency room at Heartland Hospital in 2008 for an emotional condition (Tr. at 70). Plaintiff has panic attacks -- she gets hot and sweaty, her mind will not stop thinking bad thoughts (but not thoughts of hurting people), she cannot sleep or eat, and she feels like she can't swallow (Tr. at 62). "Like, I don't want to go out and eat in public because I'm scared of choking and people seeing me." (Tr. at 62). Plaintiff has a panic attack "maybe every month." (Tr. at 71). They last until she gets out of the situation she is in, which she estimated to be about a half hour (Tr. at 71). During that half hour, she is not functioning (Tr. at 71). She cries and shakes and just sits there or stands there and tries to get out of the situation (Tr. at 72).

Plaintiff has a driver's license (Tr. at 62). Even though she doesn't like to drive, if her son wants to go somewhere or do something, she drives him (Tr. at 63). Plaintiff does not like to drive because she feels overwhelmed all the time. "And I don't like having to deal with people, I guess. I don't know. I just don't like driving." (Tr. at 63). Later when asked whether she drives, she said, "Yeah, sometimes." (Tr. at 82).

Plaintiff does not go see doctors because she does not want to leave her house -- she feels like everyone is looking at her and "saying stuff" about her (Tr. at 63). When she does go to the doctor, she just wants to get in and get out, and if she has to sit there and wait, she worries and worries (Tr. at 63). When she gets back to see the doctor, she feels like something has "been lifted off" her (Tr. at 63-64). But the whole time she is in with the doctor, she cannot wait to get out of there and go home (Tr. at 64).

Plaintiff was asked whether she is able to bathe and care for her own personal hygiene without help (Tr. at 64). "Yes. I mean, sometimes when my MS is really -- my nerves are really bad, I do need somebody to help me get dressed and just help me with daily activities, daily things." (Tr. at 64). She was asked what is it about getting dressed that causes her problems (Tr. at 64). Plaintiff said, "The numbing -- the numbing and tingling is so bad that I can't -- I can't -- I -- it's hard to have anything touching it. And so the muscles, like, feel like jell-o. And so I feel off-balanced really bad. And -- I don't know, I can't explain it. It's just hard to do it for myself, I mean, it's -- because I feel so off-balance that I have to have somebody help me." (Tr. at 64, 77). Plaintiff said that she can use her arm but cannot lift anything because it feels like she is going to drop it (Tr. at 77-7). Plaintiff is not able to do any cooking (Tr. at 64). Both of her sisters help when they can, and she eats a lot of microwaved things (Tr. at 64). When asked what problems she has with cooking, plaintiff said, "Just sitting there, concentrating on cooking." (Tr. at 65). Plaintiff is able to do a few dishes and do laundry (Tr. at 65, 82). Her 17-year-old son does "the big stuff" like dusting, vacuuming, cleaning out the refrigerator, or the dishes if there are a lot of them (Tr. at 65). Plaintiff does no outdoor work (Tr. at 82).

Plaintiff has stairs in her home and she is able to climb stairs although she avoids them (Tr. at 65). When she climbs stairs, her knees crack and hurt, so she avoids stairs (Tr. at 66).

Plaintiff can stand for 10 minutes "at the most" (Tr. at 66). After that she feels overwhelmed (Tr. at 66). She does not have physical problems from standing too long, "it's more mental" (Tr. at 66). Plaintiff can lift her arms above her head (Tr. at 66). It hurts, though, so she will only do it if she has to -- it is not something she does every day (Tr. at 66-67). It hurts in her upper arm at the injection site when she raises her arms (Tr. at 67). Using her arms makes her pain worse (Tr. at 67).

Plaintiff squats to pick things up off the floor, and she does not have difficulty with that (Tr. at 67). When asked how long she could sit at a time, plaintiff was reminded that she had been sitting for an hour at that point in the hearing (Tr. at 81). She said, "Yeah, well, I don't want to be sitting here anymore." (Tr. at 81). Plaintiff was asked how long she could stand in line to wait for a million dollars, and she said after an hour she would rather get out of line than stand any longer to collect a million dollars (Tr. at 81).

Plaintiff has headaches so bad that she has to go to the emergency room to get a shot (Tr. at 67). She has had to do that three times in the last year (Tr. at 67-68).

Plaintiff's social activities consist of doing things with her kids, because her kids are the only people she is comfortable being around (Tr. at 68). She likes being around her other family members but is not comfortable being around them (Tr. at 68). When asked whether she attends school activities with her son, plaintiff testified:

> I can go. I just -- I don't like -- I try to avoid it. I try to -- you know, my son usually doesn't ask me, because he knows how I feel, but there's sometimes that he does want me there, and so he will, and so I will go. But I can't stand being there. It eats at me and eats at me until I can leave.

(Tr. at 68).

When plaintiff worked at Arby's in 2007 she was a cashier and worked around people (Tr. at 72). When asked how she dealt with that, plaintiff said, "When I first started working there, it was fine. And then once I started being around people, it's -- it just gets

14

overwhelming. I feel overwhelmed. And then it's, like, I'll have to shell up and regather myself. And then I feel -- I just get down in the dumps abouth ow I live my life and what's going on. And I want to do better, so I go find another job" (Tr. at 72).

2.    **Vocational expert testimony.**

Vocational expert Dr. Jerry Beltramo testified at the request of the Administrative Law Judge. Despite plaintiff having had multiple different positions, only two qualified as substantial gainful activity -- restaurant crew member and nursing assistant -- and she had substantial gainful activities in only three years between 1993 and 2008 and those were in 1996, 1997 and 1998 (Tr. at 86-87).

The first hypothetical involved a person who can do the full range of sedentary work with the following exceptions: the person can perform only simple, repetitive, routine work that is as stress free as possible; the person has only limited contact with the public and co-workers; the person could do no repetitive movement of the neck, no repetitive overhead lifting, no reaching or working above shoulder level; due to the person's obesity only occasional bending and stair climbing and no crawling, kneeling, crouching, squatting, or lifting from floor level; the person would need a sit/stand option where the person could alternate sitting and standing at will; and the person would need to avoid hot humid conditions (Tr. at 88, 90). The vocational expert testified that such a person could not perform either of plaintiff's past relevant positions (Tr. at 88). Those jobs are medium exertional level jobs and both require significant contact with other people (Tr. at 89). The person could, however, work as a touchup screener in the inspection, testing and sorting area, DOT 726.684-110, with 1,820 in Missouri and 66,500 in the country (Tr. at 90). The person could work as a packager, DOT 559.687-014, with 620 in Missouri and 27,400 in the country (Tr. at 90-91). The person could work as a batcher, DOT 723.687-010, with 1,025 in Missouri and 41,625 in

15

the country (Tr. at 91).

The second hypothetical was the same as the first except three days a month the person would have a "flare up" which, when combined with the daily pain from injections, would cause her to miss work (Tr. at 91-92). Since the summer weather would likely cause more symptoms and the winter fewer, the ALJ averaged it out to three missed days of work per month for the year (Tr. at 92). The vocational expert testified that such a person could not work (Tr. at 92).

C.      *SUMMARY OF MEDICAL RECORDS*

On August 2, 2007, plaintiff went to the emergency room at Heartland Regional Medical Center complaining of anxiety (Tr. at 357-360). Plaintiff had had a baby a few days earlier. She was seen in her regular doctor's office and was started on Effexor. She said she had been taking the Effexor for two days but had not been eating or drinking because she felt like something was caught in her throat and her throat was dry. "Has been anxious because she is the only care provider for her newborn daughter at home and is concerned that something might happen to her." Plaintiff had no hallucinations, no depressive symptoms, no suicidal ideation. "The patient [is] just here because she feels like she needs some IV fluids, because she has not been able to eat or drink. However, today she has been able to take fluids. . . . She has no back pain." Plaintiff was smoking one and a half packs of cigarettes per day. She reported taking Effexor, Motrin (non-steroidal anti-inflammatory) and Percocet (narcotic). A physical exam was performed and was normal, including her strength, her gait, her extremities and her back. She was alert, speaking in full sentences, and in no acute distress. "She is here just with what appears to be anxiety symptoms at this point. There appears to be no acute medical issue with her." Plaintiff was able to eat, drink, speak and breathe without difficulty. Lab work was normal. Plaintiff indicated she was feeling better and was told the

16

Effexor would take a couple days to start working. Plaintiff was given three Xanax tablets (for anxiety) and discharged.

Later that same day, plaintiff went back to the emergency room at Heartland Regional Medical Center for a mental health evaluation (Tr. at 350-356). Plaintiff said that she was afraid she would fall asleep and not be able to take care of her baby. "She has been started on Effexor but has not been taking effect yet." Plaintiff was three days post partum. Plaintiff's physical exam was normal, lab work was normal. "Drug screen positive for benzodiazepines [Xanax is a benzodiazepine]." Plaintiff was noted to be eating and drinking without difficulty. She was evaluated by a mental health expert and was "medically cleared." Plaintiff was diagnosed with anxiety.

On August 14, 2007, plaintiff was seen at Northwest Health Services (Tr. at 259-260). Plaintiff said she had a baby two weeks earlier, and three days after giving birth she started having numbness and tingling in her left arm and hand. She was not feeling tired or poorly. She reported a past medical history of boils, "being treated," and anxiety for which she was taking Effexor XR. She was smoking one pack of cigarettes per day and reported herself as a social drinker. She reported working "full time" and was having problems with sleep as she would wake up every half hour. Plaintiff's physical exam was normal, including her musculoskeletal exam, except Tinnel's sign[5] was positive and peripheral neuropathy[6] was noted in her wrist. Her mental status exam was normal. Despite having noted that plaintiff

_____

[5] A tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve.

[6]"Peripheral neuropathy, a result of nerve damage, often causes weakness, numbness and pain, usually in your hands and feet, but it may also occur in other areas of your body. People generally describe the pain of peripheral neuropathy as tingling or burning, while they may compare the loss of sensation to the feeling of wearing a thin stocking or glove." http://www.mayoclinic.com/health/peripheral-neuropathy/DS00131

17

was not feeling tired or poorly, the doctor assessed "Feeling tired or poorly" along with carpal tunnel syndrome,[7] nicotine dependence, and depression. The doctor told plaintiff to stop smoking and gave her a prescription for Wellbutrin SR (treats depression and aids in quitting smoking). It appears that the medical records at Northwest Health Services were not always properly updated -- every record indicates that plaintiff was working full time (when she clearly was not) and that she reported waking up every half hour and that she was not feeling tired or poorly. These statements are contradicted, sometimes even in the very records of Northwest Health Services.

On August 22, 2007, plaintiff saw Arjumand Jaffri, M.D., a psychiatrist (Tr. at 288, 290-291). Plaintiff said she had been seeing another mental health provider but stopped her medication a year earlier when she got pregnant. She became severely depressed after her daughter was born. She was anxious, crying and pacing the time. Her OB/GYN prescribed Effexor (treats anxiety and depression). Plaintiff said she was hospitalized in 1994 for severe depression. Plaintiff reported no thoughts of harming her infant daughter, no obsessive compulsive disorder, no history of violence, no periods of euphoria, grandiosity or flight of ideas. "She has a strong support system of friends and family." Plaintiff said she dropped out of school in 11th grade because she did not care about school but she got a GED. She lived with a man for 13 years but was no longer in a relationship. She had a history of marijuana usage in high school but not as an adult. She was smoking one pack of cigarettes per day. She said she had a steady job up until six months ago. Dr. Jaffri performed a mental status exam and noted that plaintiff was alert and oriented, neatly dressed, very pleasant and cooperative,

[7]"Bound by bones and ligaments, the carpal tunnel is a narrow passageway -- about as big around as your thumb -- located on the palm side of your wrist. This tunnel protects a main nerve to your hand and nine tendons that bend your fingers. Compression of the nerve produces the numbness, pain and, eventually, hand weakness that characterize carpal tunnel syndrome." http://www.mayoclinic.com/health/carpal-tunnel-syndrome/DS00326

Case 5:12-cv-06026-REL   Document 17   Filed 08/19/13   Page 18 of 55

her mood was fair, affect was congruent, she talked affectionately to her daughter while playing with her and feeding her. No delusions were noted, memory and concentration were fair, insight and judgment were fair. Plaintiff was assessed with Major Depressive Disorder, recurrent, moderate; post-partum depression and panic attacks, and she was assessed with a GAF of 60.[8] Plaintiff said her current dose of Effexor had been effective, so Dr. Jaffri continued her on that same medication at the same dose. Dr. Jaffri encouraged plaintiff to participate in counseling and gave her the phone number to two organizations.

On September 10, 2007, plaintiff saw Dr. Jaffri for a follow up (Tr. at 291). Plaintiff reported having some residual symptoms of anxiety but was able to handle it. Dr. Jaffri performed a mental status exam and observed that plaintiff was alert and oriented, neatly dressed, pleasant and cooperative. Her mood was fair, affect congruent, no suicidal or homicidal ideation, no psychiatric symptoms, memory and concentration were fair. Plaintiff was assessed with Major Depressive Disorder in partial remission. She was told to continue her same medications, and Dr. Jaffri again encouraged counseling.

On October 22, 2007, plaintiff saw Dr. Jaffri for a follow up (Tr. at 289). Plaintiff said she was doing better, her anxiety and depression had improved, she was not crying, thought processes were clear and goal directed. "Planning to go to work and has set up a day care for her daughter." Dr. Jaffri performed a mental status exam and observed that plaintiff was alert and oriented, neatly dressed, very pleasant and cooperative, her mood was fair and affect was congruent, she had no suicidal or homicidal ideation and no psychiatric symptoms, memory and concentration were fair, insight and judgment were fair. She reported no medication side effects. She reported that she occasionally drinks but not to intoxication. Plaintiff was assessed

---

[8]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

19

with Major Depressive Disorder in partial remission. She was told to continue her medications. "Strongly advised against drinking and suggested AA if needed."

On November 12, 2007, plaintiff was seen at Northwest Health Services complaining of having been shot in the right hand with a bb gun (Tr. at 258-259). She also complained of boils (pus-filled bumps under the skin caused by bacteria infecting and inflaming a hair follicle) over her legs. She was not feeling tired or poorly. She was taking Ibuprofen (non-steroidal anti-inflammatory) and Effexor XR (treats anxiety and depression). Plaintiff reported a past medical history of boils, "being treated," and anxiety for which she was taking Effexor. She was smoking one pack of cigarettes per day and reported herself as a social drinker. She reported working "full time" and was having problems with sleep as she would wake up every half hour. X-rays of plaintiff's hand revealed a metallic BB in the soft tissues of the right hand (Tr. at 261). Plaintiff's musculoskeletal exam was normal; her mental status exam was normal. The rest of her physical exam was normal except for boils under her skin and erythema (a hypersensitivity reaction to medication). She was assessed with carbuncle (a cluster of boils, which are pus-filled bumps under the skin caused by bacteria infecting and inflaming a hair follicle) on the right thigh and carbuncle on the left thigh. The doctor told her to "maintain regular exercise" and prescribed an antibiotic.

On November 29, 2007, plaintiff was seen at Northwest Health Services complaining of a painful, swollen lip (Tr. at 256-258). She was not feeling tired or poorly. She was taking Effexor XR. Plaintiff reported a past medical history of boils, "being treated," and anxiety for which she was taking Effexor. She was smoking one pack of cigarettes per day and reported herself as a social drinker. She reported working "full time" and was having problems with sleep as she would wake up every half hour. Plaintiff's mental status exam was normal, and her physical exam was normal except she had a swollen lip with a lesion. She was assessed

20

with carbuncle.  She was given prescriptions for antibiotics.

On December 5, 2007, David Halbach, M.D., removed a cyst from plaintiff's right hand (Tr. at 347).

On December 17, 2007, plaintiff failed to show for her appointment with Dr. Jaffri (Tr. at 287).

On January 23, 2008, plaintiff failed to show for her appointment with Dr. Jaffri (Tr. at 287).

On January 29, 2008, plaintiff saw Dr. Jaffri for a follow up (Tr. at 287).  Plaintiff reported that her anxiety had improved with Vistaril (treats anxiety).  "Her mood is good.  No dysphoria,[9] crying or angry outbursts.  No SE [side effects] from Vistril [sic]."  Dr. Jaffri performed a mental status exam and noted that plaintiff was alert and oriented, neatly dressed, pleasant, well groomed.  Her mood was fair, affect and mood were congruent, she had no suicidal or homicidal ideation, no psychiatric symptoms, memory and concentration were fair, insight and judgment were fair.  Dr. Jaffri noted that plaintiff was not in counseling.  She assessed Major Depressive Disorder in partial remission and told plaintiff to continue her current medications and "continue supportive therapy."

February 1, 2008, is plaintiff's alleged onset date.

On March 16, 2008, plaintiff went to the emergency room at Heartland Regional Medical Center complaining of left groin pain for the last three weeks (Tr. at 342-346).  The pain was not radiating anywhere.  Plaintiff reported a history of anxiety but no other medical history.  She continued to smoke.  Effexor was her only medication.  Her extremities were normal, the remainder of her physical exam was normal except some right-sided tenderness.  Lab work was done.  Plaintiff was assessed with groin pain of unknown etiology and was told

---

[9]A state of feeling unwell or unhappy.

to follow up with her primary care physician.

On April 9, 2008, plaintiff failed to show for her appointment with Dr. Jaffri (Tr. at 287).

On May 1, 2008, plaintiff saw Dr. Jaffri for a follow up (Tr. at 286). "She is doing good and not needing her Vistaril." Plaintiff said her "Effexor is doing good." She denied any dysphoria, crying or anhedonia.[10] "Helps her mother in law at her day care and feels happier. Sleep and appetite OK." Dr. Jaffri performed a mental status exam and noted that plaintiff was alert and oriented, neatly dressed, pleasant and cooperative, euthymic, affect and mood were congruent, no suicidal or homicidal ideation, no psychiatric symptoms, memory and concentration were fair, insight and judgment were fair. Plaintiff was taking Effexor XR and Vistaril (treats anxiety) with no side effects. Dr. Jaffri assessed Major Depressive Disorder in partial remission. She continued plaintiff on her same medications.

On May 28, 2008, plaintiff was seen at Northwest Health Services (Tr. at 254-256). Plaintiff said she had been unable to hear out of her right ear for the past two weeks. She reported taking Effexor XR (treats anxiety and depression). She reported past medical history of boils, "being treated," and anxiety disorder for which she was taking the Effexor. She was smoking one pack of cigarettes per day and reported herself as a social drinker. Plaintiff reported working "full time" and she was having problems with sleep as she would wake up every half hour. Plaintiff said she was not feeling tired or poorly, she had no earache or hearing loss. Plaintiff's exam was entirely normal. She was assessed with eustachian tube dysfunction of the right ear. She was prescribed a Medrol dose pak (steroid) and was told to take over-the-counter Sudafed and try to pop her ears three times a day by chewing gum.

On June 14, 2008, plaintiff went to the emergency room at Heartland Regional Medical

---

[10]An inability to experience pleasure from activities usually found enjoyable.

Case 5:12-cv-06026-REL   Document 17   Filed 08/19/13   Page 22 of 55

Center reporting vaginal bleeding (Tr. at 338-341). Plaintiff was smoking one pack of cigarettes per day. She denied any medical history. She denied any musculoskeletal symptoms, she denied any ENT symptoms. "All other systems reviewed and otherwise negative." A physical exam was performed. Skin was normal, ears were normal, back was normal, extremities were normal, neurological exam was normal. Plaintiff was given ibuprofen and was discharged.

On July 23, 2008, plaintiff failed to show for her appointment with Dr. Jaffri (Tr. at 286).

On August 11, 2008, plaintiff saw Dr. Jaffri for a follow up (Tr. at 285). Plaintiff reported brief periods of increased anxiety and sadness, "maybe once a week". She denied any increased crying. Dr. Jaffri performed a mental status exam and noted that plaintiff was pleasant and cooperative with euthymic affect and congruent mood, no suicidal or homicidal ideation, no psychiatric symptoms, memory and concentration were fair, insight and judgment were fair. Plaintiff was assessed with Major Depressive Disorder in partial remission. Dr. Jaffri told plaintiff to increase her Effexor dosage and referred her for therapy.

On August 22, 2008, plaintiff was seen at Northwest Health Services (Tr. at 253-254). She complained that her right ear was still hurting and feeling clogged up, and her head, hands and left leg felt tingly. Plaintiff said she was taking Effexor XR. She reported past medical history of boils, "being treated," and anxiety disorder for which she was taking the Effexor. She was smoking one pack of cigarettes per day and reported herself as a social drinker. Plaintiff reported working "full time" and she was having problems with sleep as she would wake up every half hour. Plaintiff's mental status exam was normal. Plaintiff was diagnosed with eustachian tube dysfunction, she was told to stop smoking, and she was told to continue taking the Effexor. The doctor prescribed Prednisone (steroid) for five days, Flonase

Case 5:12-cv-06026-REL   Document 17   Filed 08/19/13   Page 23 of 55

(steroid nasal spracy) (with three refills), Ibuprofen (non-steroidal anti-inflammatory) 800 mg to take as needed up to three times a day for 30 days (with five refills).

On August 27, 2008, plaintiff saw David Kropf, M.D., an ear, nose and throat specialist (Tr. at 270). She complained of hearing loss over the past three months and pain described as a 10/10 for the past week. Plaintiff reported smoking one pack of cigarettes per day and being a social drinker of alcohol. She was on Medicaid. Plaintiff's physical exam was normal, her gait was observed to be normal. Plaintiff was assessed with otalgia (ear ache), hearing loss, and atypical face pain. Dr. Kropf recommended an MRI and told plaintiff to see her primary care physician for pain management.

On September 2, 2008, plaintiff had an MRI after having been referred by Dr. Kropf (Tr. at 274-278, 333-336). Douglas Goodman, M.D., observed a lesion on the left side of plaintiff's brain.

On September 9, 2008, plaintiff saw Dr. Kropf to go over her MRI results (Tr. at 271). Plaintiff continued to complain of right ear hearing loss and itching in her right ear canal. She said it had been going on for four months and that steroids and Sudafel had been no help. Plaintiff's physical exam was normal, including her gait and her "communication ability." Dr. Kropft recommended plaintiff see a neurologist.

On September 30, 2008, plaintiff saw Nitin Sharma, M.D., with Heartland Neurology (Tr. at 296-299). She reported hearing loss for the past two months and numbness over the right side of her body for the past month. She was taking only Effexor XR. Plaintiff said she had no motor weakness, no balance problem, no visual disturbances, no headaches, no shortness of breath. Plaintiff continued to smoke. Plaintiff was noted to be alert and oriented, "comfortable, participates in conversation well, follows commands appropriately". On exam plaintiff was found to have normal facial strength with no abnormal movements, normal

swallowing. All extremities had normal extension and flexion, normal muscle strength, no involuntary movements and no muscle asymmetry. Her gait was normal. Everything on her exam was normal except plaintiff felt a tingling sensation on the right part of her face on touch sensation testing. Her attention span was normal, mood and affect were normal. Dr. Sharma talked to plaintiff about cervical radiculopathy and multiple sclerosis. He ordered an MRI of her cervical spine along with lab work.

On October 6, 2008, plaintiff had x-rays of her cervical spine which were normal (Tr. at 332).

That same day plaintiff saw Dr. Jaffri for a follow up (Tr. at 284). The record quotes plaintiff as having said, "I am doing good." Plaintiff said she did not increase her Effexor because she "thought [she] could handle it." Dr. Jaffri wrote, "She is doing well and handling things well. She is being evaluated for MS. Her mood is good." A mental status exam was performed. Plaintiff was noted to be pleasant, neatly dressed, no suicidal or homicide ideation, no psychiatric symptoms, memory and concentration were fair, insight and judgment were fair. Plaintiff was taking Effexor XR. With that she was "doing well" and had no side effects. Plaintiff was assessed with Major Depressive Disorder in partial remission. She was told to continue her current medications and return in two months or as needed.

On October 13, 2008, plaintiff saw Dr. Sharma for a follow up (Tr. at 301-302). "She missed her appointment for a spinal tap." Plaintiff was noted to be "comfortable, participates in conversation well, follows commands appropriately." Her exam was normal except she had

Case 5:12-cv-06026-REL   Document 17   Filed 08/19/13   Page 25 of 55

mild swelling with local tenderness over the right submandibular area.[11] She had normal swallowing, normal facial strength with no abnormal movements. All of her extremities had normal range of motion and normal muscle strength. She was able to walk with good stability. Her attention span was normal, mood and affect were normal, and she was oriented. Plaintiff's cervical spine x-ray was normal, but Dr. Sharma rescheduled her spinal tap and cervical MRI. He again discussed multiple sclerosis and cervical radiculopathy and indicated he was going to confer with Dr. Duad about plaintiff's blood work which showed an elevated anticardiolipin antibody.

On October 16, 2008, plaintiff had an MRI of her cervical spine due to her complaints of right-sided head and facial numbness over the past three months (Tr. at 264-265, 305-306, 330-331). The results were normal. She specifically had no central or lateral impingement at C2-3, C3-4, C4-5, C5-6, C6-7, or C7-T1.

On October 29, 2008, plaintiff saw Dr. Sharma for a follow up on her lab work (Tr. at 303-304). Plaintiff said she was feeling better, they discussed the results of her tests. She had no symptoms. She was noted to be "comfortable, participates in conversation well, follows commands appropriately." She had normal swallowing, normal muscle tone and strength in all extremities, she was "walking with good stability". Her attention span was normal; mood and affect were normal. Dr. Sharma provisionally diagnosed plaintiff with multiple sclerosis

---

[11]

but said he wanted to confer with a rheumatologist before he made his final diagnosis. Plaintiff was prescribed Prednisone (steroid) for 2 1/2 weeks.

On October 31, 2008, plaintiff saw Umar Daud, M.D., a rheumatologist at the Heartland Arthritis Center after having been referred by Dr. Sharma (Tr. at 377-379). Plaintiff reported that she had had poor balance and had fallen. She reported a long history of hip pain and low back pain. She also complained of muscle pain and muscle weakness, and she said she is stiff in the morning for a few minutes. She complained of sleep problems, nervousness and depression. Plaintiff reported smoking a pack of cigarettes per day, drinking beer on the weekends, and being currently unemployed. On exam plaintiff was observed to be pleasant and in no acute distress. "She is tender over some joints of the hands without any synovitis.[12] She is tender in the lumbar spine without any point tenderness. Straight leg raising was negative. Good range of motion of the hips." Dr. Daud ordered repeat testing, lab work, and x-rays. "For low back pain we will check x-rays of the lumbar spine and hips. I have asked her to reduce her exercising and quit smoking."

On October 31, 2008, plaintiff had x-rays of her pelvis and hips after complaining of bilateral hip pain (Tr. at 323). The results were normal. She had x-rays of her lumbar spine due to complaints of low back pain and history of multiple sclerosis (Tr. at 324). The results were normal.

On November 10, 2008, plaintiff applied for disability benefits.

On December 23, 2008, plaintiff saw Dr. Jaffri for a follow up (Tr. at 397). Plaintiff reported that she was diagnosed with multiple sclerosis about three weeks earlier and was feeling anxious about the shots she had to take for therapy. "Occasionally has low mood but is handling it well. No crying or anhedonia. No self inj[urious] behavior." Dr. Jaffri performed

---

[12]Inflammation of a joint-lining membrane.

a mental status exam. Plaintiff was noted to be alert and oriented, casually dressed, cooperative, pleasant. Her speech had regular rate and rhythm, she had no suicidal or homicidal ideation, no psychiatric symptoms. Her memory and concentration were fair. She was "doing well" on Effexor with no side effects. Plaintiff was assessed with Major Depressive Disorder in partial remission and multiple sclerosis. Plaintiff was to continue on her current medications and return in two months.

On January 9, 2009, plaintiff saw Dr. Sharma (neurologist) for a follow up (Tr. at 399-400). Plaintiff's medications were listed as Prednisone (steroid) and Effexor (for anxiety and depression). "On copaxone now" and plaintiff was doing better with her paresthesia. She complained of off and on body soreness and aches and pains since she started using the copaxone. Plaintiff was observed to be "alert and oriented, comfortable, participates in conversation well, follows commands appropriately." Dr. Sharma performed a physical exam and noted that plaintiff had normal facial strength with no abnormal movements, normal swallowing, normal muscle tone and strength in all extremities, she was able to walk with good stability and no shuffling. The rest of her physical exam was normal. "[H]er body paresthesias recovered since on copaxone and doing well. She is stressed and cryful with life and get nervous. My impression for underlying stress/anxiety disorder and advised biofeedback/meditation and physical exercises. She is on Effexor. It help[s] her." Dr. Sharma ordered blood work and told plaintiff to follow up in three months.

On February 17, 2009, plaintiff failed to show up for her appointment with Dr. Jaffri (Tr. at 397).

On February 23, 2009, plaintiff saw Dr. Sharma for a follow up (Tr. at 401-403). "She is feeling stiffness and pain over her neck and seen at ER." Plaintiff's neck x-rays in the hospital were reported to have been normal. Plaintiff was observed to be alert and oriented,

comfortable, participating in conversation well and following commands appropriately. Dr. Sharma noted that plaintiff had muscle spasm, stiffness and painful mobility with her neck. On exam she had normal muscle tone and strength in all extremities, normal swallowing, and was able to walk normally with good stability. Her mood and affect were noted to be anxious. She was diagnosed with neck pain and multiple sclerosis. Dr. Sharma prescribed diazepam (treats anxiety and muscle spasms) and Flexeril (muscle relaxer) and was told to use one at night and one during the day. Plaintiff's multiple sclerosis was noted to be stable on copaxone.

On April 9, 2009, plaintiff saw Dr Jaffri for a follow up (Tr. at 396). "She is doing well." Plaintiff said she was occasionally feeling worried when she thinks about having multiple sclerosis. Plaintiff reported no dysphoria, no crying, no angry outbursts. Dr. Jaffri performed a mental status exam. Plaintiff was alert and oriented, casually dressed, neatly groomed, pleasant and euthymic. Her affect and mood were normal and congruent. She had no suicidal or homicidal ideation, no psychiatric symptoms, her memory and concentration were fair. She was taking her Effexor. "Doing well. Anxiety but controlled." Plaintiff was assessed with Major Depressive Disorder in partial remission and multiple sclerosis. Dr. Jaffri encouraged therapy to help deal with stressors. Plaintiff was told to continue taking Effexor and to return in three months.

On January 23, 2009, Joan Singer, Ph.D., completed a Psychiatric Review Technique and found insufficient evidence of a mental impairment (Tr. at 384-395). In support of her findings, Dr. Singer noted that plaintiff's diagnoses of anxiety disorder in August 2007 are not from a medically-acceptable source as they were made by a nurse practitioner. Additionally, plaintiff was noted to have worked full-time a year after the diagnoses were made. Dr. Jaffri's records of August 2007 included major depressive disorder, postpartum depression and panic attacks, but nine months later plaintiff was noted to have been helping her mother-in-law in

29

her day care and felt happier. In August 2008 she was noted to be having brief periods of increased anxiety and sadness maybe once a week. On October 6, 2008, she was "doing good" and had not increased her dosage of Effexor as suggested because she felt she could "handle it." She was doing well, handling things well, and her mood was good. "As the claimant failed to return the Function or Work History Report, she was contacted by DDS counselor by phone on 1/06/09. After some discussion, the claimant had agreed to return the Function Report and counselor agreed to obtain work history at a later date by phone. However, as of date of dictation, the claimant has not returned the Function report. Based on available evidence, the claimant did not have a psychiatric impairment of disabling severity prior to the DLI [date last insured] of 6/30/08. No further medical development is undertaken currently due to claimant's failure to provide requested information."

On May 15, 2009, plaintiff saw Peggi Lucas, a nurse practitioner (Tr. at 410-411). Plaintiff said that ever since she was diagnosed with multiple sclerosis, she had been having a lot more anxiety. Plaintiff denied depression. Plaintiff continued to smoke one pack of cigarettes per day and said she was a social drinker. Plaintiff's back had tenderness on palpation. She was assessed with "feeling tired or poorly," depression, and anxiety disorder not otherwise specified. She was continued on her same medications.

On July 27, 2009, plaintiff saw Dr. Sharma for a follow up (Tr. at 404-406). Plaintiff said that in the last few days she had experienced numbness and tingling, and one "one night" she had a choking sensation over food. She had been seen in the emergency room and her tests were normal. "Now doing well. Tolerating her copaxone well. Her low back pain [is] better." Plaintiff was observed to be alert and oriented, comfortable, participating in conversation well and following commands appropriately. Plaintiff's exam was normal including her ability to swallow, her muscle tone and strength in all extremities, and her gait was normal. Dr. Sharma

indicated that her paresthesia was likely a "mild flare" of her multiple sclerosis due to the hot humid summer weather. "She is doing well with copaxone." Plaintiff's CT of her brain and her blood work up from the ER were OK. As far as her low back pain, conservative measures were recommended and Dr. Sharma "advised against use of narcotics". He told her to avoid the heat and increase her fluid intake. She was to follow up in six months.

On August 4, 2009, plaintiff was seen by Peggi Lucas, a nurse practitioner (Tr. at 409). Plaintiff reported that she was feeling tired and was having hip problems. Plaintiff was continued on her same medications.

On March 23, 2010, plaintiff was seen by Vickie Kimball, a nurse practitioner, for a refill on Effexor (Tr. at 408-409). Plaintiff denied anxiety, denied depression, denied sleep disturbances. Ms. Kimball performed a physical exam and noted that plaintiff's back was normal with no costovertebral[13] tenderness. Her musculoskeletal system was normal. "Patient reports no depression or anxiety." Plaintiff maintained eye contact throughout the interview. Plaintiff was assessed with multiple sclerosis and anxiety disorder not otherwise specified. Exercise was encouraged (Tr. at 409). Plaintiff was continued on her Effexor.

On November 30, 2010, plaintiff was seen by Nicholas Bingham, M.D., at the request of Disability Determinations (Tr. at 412-416).

---

13



Case 5:12-cv-06026-REL   Document 17   Filed 08/19/13   Page 31 of 55

HISTORY OF PRESENT ILLNESS:  This is a pleasant 36-year-old female in no acute distress. . . .  The pain is, at best, 5 of 10 in the right neck/shoulder area and opposite leg.  It is tingling and severe pins and needle sensation.  It can be as bad as 10 of 10 and she cannot get out of bed.  She states that she has 5 of 10 days about 20 out of 30 days in a month.  The severe 10 of 10, about two days a month. She was on Copaxone for a while but has been changed as she was developing skin lesions.

The patient has also suffered depression and anxiety times 15 years.  She is improved but not cured with meds. When she has an attack she has difficulty swallowing. She worries about most everything. She also has components of agoraphobia. She cannot do her own grocery shopping; her sister does it.  She can go into a store and pick up a single item if she gets in and out quickly.  She cannot tolerate Walmart as there is too much crowding and activity there. She has long-standing depression as characterized by amotivation mostly. . . .  She does not have a psychiatrist; she [has] been seen at a clinic but this clinic now requires that she have a case manager, more or less a social worker, to follow her which she finds intrusive and does not wish to submit to.  She cannot find a psychiatrist currently that will take Medicaid. The patient states she has considerable anxiety over her 18-year-old son because he states he has been hearing voices since he was five years old, and feels he may be acting out on these voices.

* * * * *

SOCIAL HISTORY:  The patient is single. She has an 18-year-old son and a 3-year-old daughter at home with her. She is a smoker of one pack-per-day since the age of 14. . . .

* * * * *

PHYSICAL EXAMINATION:  . . .  Pain 7 of 10.  In general, this is a well-developed, well-nourished female in no acute distress.  She is alert, oriented, and cooperative.  She seemed somewhat agitated and suspicious of the process.  She also, at times during the history, became quite tearful, and showed mild psychomotor agitation at other things.  Her hygiene is good.  I would estimate her level of intelligence to be above average.  She uses no assistive devices for ambulation and none are indicated.  She is left hand dominant.  Her affect is variable. . . .

Musculoskeletal exam revealed a normal fluid gait. Tandem walking[14] was not possible. Romberg[15] was mildly positive.  No difficulty getting on or off the exam table.  Exam of the dorsolumbar spine shows tenderness in the left lumbosacral area and mildly limited range of motion. . . .  Straight leg raise was negative. Range of motion of the shoulders, elbows, wrists, hips, knees and ankles was full and bilaterally symmetrical and

---

[14]Tandem gait is a method of walking where the toes of the back foot touch the heel of the front foot at each step.

[15]The patient stands still with his heels together and is then asked to remain still and close his eyes.  If the patient loses his balance, the test is positive.

unguarded. . . . Range of motion of all joints of the hands and fingers were normal. There were no significant degenerative findings evident. . . . There was no atrophy or asymmetry noted. The patient was able to make a fist with both hands. Manual dexterity was normal. . . . There were subjective complaints of loss of sensation in the face, neck and shoulder area, and the left lower extremity. The patient complains of allodynia[16] almost with any kind of palpation of the lower extremity. She states that even taking a shower can sometimes be painful for her.

* * * * *

PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT: The following recommendations are based on my clinical judgement and reflect the claimant's ability to perform work related functions within a regular work setting on a day to day basis. She can sit six ours [sic] in an eight-hour day, and can stand and walk four hours in an eight-hour day. I would estimate she can lift 30 pounds occasionally and 10 to 20 pounds frequently. Pushing and pulling would be unrestricted other than as indicated for lifting and carrying. Due to paresthesia, she should be restricted from climbing ladders and balancing at unprotected heights. No particular contraindications to bending, stooping, kneeling, crouching or crawling. Due to poor neck mobility, caution should be used with driving. There are restrictions with regard to hearing and speaking. Agoraphobic components, however, would preclude her from working with the public. There are no environmental imitations such as exposure to fumes, odors, dust, gases, poor ventilation or machinery hazards. Paresthesia might make tolerating heat, cold and vibrations difficult.

EXPLANATION: I feel this examinee's primary barrier to competitive labor market is anxiety. It would seem to be inadequately and incompletely treated. She has physical complaints related to the multiple sclerosis, and this will require ongoing care. Physically, however, I do not feel that she is disabled from all occupations within her level of competence. I would recommend psychological re-evaluation.

---

[16]A condition in which pain arises from a stimulus that would not normally be experienced as painful.

33

Plaintiff's knee range of motion[17] was 100° (normal is 150°). Forward flexion[18] of her hip was 80 on the right and 90 on the left (normal is 100). Abduction was 20 on the right, 30 on the left (normal is 40). Adduction was 10 on the right, 15 on the left (normal is 20). Ankle dorsiflexion[19] was 10 bilaterally (normal is 20), and plantar flexion was 30 bilaterally



[17]

[18]

[19]

Case 5:12-cv-06026-REL   Document 17   Filed 08/19/13   Page 34 of 55

(normal is 40).  Flexion of the cervical spine[20] was 20 (normal is 50), extension was 45 (normal is 60).  Cervical spine rotation was 70 to the right, 40 to the left (normal is 80).  Lumbar spine flexion (bending forward was 75 (normal is 90), and lateral flexion (bending side to side) was 20 on the right, 15 on the left (normal is 25).

On December 3, 2010, Dr. Bingham completed a Medical Source Statement (Tr. at 418-423).  He found that plaintiff could continuously lift and carry up to 10 pounds, frequently lift and carry 11 to 20 pounds, occasionally lift and carry 21 to 30 pounds, and never lift more than 30 pounds.  He found that plaintiff could sit for 4 hours at a time and for 6 hours total per work day; stand for 2 hours at a time and for 4 hours total per work day.  He found that plaintiff could frequently reach overhead, frequently reach in all other directions, frequently handle, frequently finger, frequently feel, and frequently push or pull with both hands.  He found that plaintiff could frequently use both feet.  He found that plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl.  Plaintiff had no impairments affecting her ability to hear or see.  She could never work at unprotected heights; she could

---

20



35

occasionally operate a motor vehicle or work around wetness, humidity, extreme temperatures and vibrations; and she could frequently work around moving mechanical parts, dust, odors, fumes, and pulmonary irritants. He found that plaintiff could be exposed to moderate noise (such as would be found in an office). He found that plaintiff could perform activities like shop, travel alone, walk a block, use standard public transportation, climb a few steps, prepare a simple meal and feed herself, care for her personal hygiene, and work with papers or files.

On January 20, 2011, Richard Taylor, Psy.D., a clinical psychologist, performed a psychological evaluation in connection with plaintiff's application for disability benefits (Tr. at 432-438).

> She was casually dressed, but was neat and clean. . . . She was accompanied by her "sister-in-law", Patty Schroeder, who provided transportation to and from the examiner's office. She explained about her relationship to Patty Schroeder, "I've dated her brother for a long time." Michelle had fairly strong tobacco breath. . . .

> Michelle reported being depressed and having anxiety attacks. She also reported having MS.

Plaintiff reported that her "family doctor" prescribes her Effexor, but she named Vicki Kimble with the North End Health Clinic who is a nurse practitioner. Plaintiff said she lived with her boyfriend and their three combined children. Plaintiff reported that her son's father died when her son was six. Her daughter's father is not in plaintiff's life. "'He's in her life. He gets her on weekends.' She denied receiving child support, but added, 'He's gonna start. I had to get a lawyer. He tried to keep her from me. He makes thirty dollars per hour and I don't get no money. He has a brand new car.'" Plaintiff was tearful when talking about her father dying in 2007. She said she did not have anything to do with her brother who is addicted to methamphetamine. Plaintiff reported that she lost her mother who does not care about coming around. "I mean my family will be there for me. My sister will help me get dressed. I feel like I have to be my family's emotional backbone."

Plaintiff reported that she got her GED 15 years after dropping out of high school. "I was in the top one percent in the country. I went one semester at Missouri Western. It's so crazy to get financial aid you have to be a full time student." With respect to her employment, plaintiff said:

> "I started off with mainly restaurant work, nursing homes, I enjoyed working with elderly people. I wanted to be a nurse. A good friend of mine worked at the dialysis center. I worked there. I loved it. I worked there for three years. I could work on Barry Road, but they do dialysis on children. I know they are going to die." She replied, "A tech, dialysis tech. I actually would do the dialysis on patients. I really enjoyed it. It made me feel important. It made me feel good about myself." Michelle replied about why she left the dialysis job, "A company bought us out. They layed [sic] off eight people." . . .

> Michelle replied that her last job, "Well I worked at Arby's. Albaugh, it's a chemical plant. I would come home with little holes in my clothes. I found out I was pregnant. I wasn't going to expose my daughter to that. I was making thirteen dollars an hour at Albaugh." She replied that she worked "less than a year, not very long" for Albaugh. Michelle replied, I was a tech, nano tech is what they call it. I would watch the computer screen. If the numbers would go beyond I would go out on the floor and turn the valves to get the numbers to be where they were supposed to be." She reported working full time for Albaugh and leaving in 2007. Michelle replied about her work at Arby's, "Just a cashier part-time." She started working for Arby's "I think it was January of '07," and left "I think it was the end of April '07." Michelle reported the reason she left Arby's "Well, my pregnancy with my daughter. I started having a lot of problems with my pregnancy. It was really M.S."

> Michelle denied having any income. She admitted to having Medicaid insurance and receiving food stamps. Michelle reported about her son, "He still collects his dad's death benefit."

Plaintiff reported that her boy friend shot her in the hand with a BB gun. "I get boils really bad. They cut them out three times. The infection would go down my leg." With respect to counseling, Dr. Taylor noted the following:

> Michelle denied receiving counseling. "No, I probably need some. When I was with Family Guidance I had Dr. Valera then Dr. Mahmood, and then they wanted me to have a care manager. I told them I didn't need a baby sitter. They dropped me. They said everybody on Medicaid has to have one. There is no place in this town you can go if you are poor. Family Guidance scheduled me an appointment for counseling. The counselor wasn't even there. I've learned to block it out. I just don't care anymore.

37

Michelle volunteered, "My anxiety has gotten so bad I can't function. It's [sic] seems to be more and more people are getting mentally ill. I don't know. It's out of my hands. I've had to go to the E.R. There are 300 people in the waiting room. I just try to find a doctor who will take me. I can't swallow. I feel like something is stuck in my throat. With Family Guidance it takes at least a month to get an assessment." She replied that her anxiety began "When my son was young. I probably need more mental health than the Effexor. My mind races. I've had two episodes since my daughter was born. I'm not gonna kill myself, but I'm ready to go. My daughter would be better off without me. I feel like I'm gonna end up screwing her life up." Michelle began to cry. She continued, "I have another son I put up for adoption. He lives in Pennsylvania." Michelle continued to cry. She reported, "My other son, he's a good kid. He helps me out a lot. Any time I tell him no, he tells he [sic] he hates me. I spoiled him. He tells me he wishes I would have died instead of his dad. My daughter is beautiful and smart. She's a true Godsend." Michelle continued to cry. "I hate myself a lot. I don't do drugs. I obey the law. I keep my house really clean. I've always made sure my kids had everything they need."

Plaintiff said that her son's grandparents "should have sixty to a hundred thousand dollars" from her son's dad but they won't give the money to her son because he does not want to go to college. "I feel so guilty. I didn't hire an attorney." Plaintiff reported that her mother abused her as a child and that she had been raped but had never told anyone about that. The rapist was her boyfriend at the time and they had been together for 14 years. "The man I'm with now is Patty's brother. He's a really good man." Plaintiff reported having been suicidal. She said her anxiety started a few months after her son's father died (or about 12 years earlier). When an anxiety attack "comes on full fledged, it will take me down. I can't function at all." Her last anxiety attack was about five months earlier. "I have anxiety all the time. Sometimes it's overwhelming." She said, "Effexor for the most part does what it is supposed to do." She said she does not want other people around her. "I don't care about nothin', except my kids." Plaintiff admitted having smoked two packs of cigarettes a day when she was pregnant with her daughter.

Plaintiff said that she used to drink a lot. "I wouldn't say I was a alcoholic. Three times a week. I had to go out and socialize. Drinking came along with it. Mainly drink beer,

six, or seven, maybe eight in a night." She said she has never used methamphetamine, but she knows more people who use than who don't.

Capabilities: Michelle admitted to reading the newspaper. She replied about cooking, "Um, when I can. My son and Jerry cooks a lot. I can't stand for long periods of time, because my legs go numb." Michelle replied, "Yeah, I do laundry. My daughter helps me." She replied about shopping, "Oh no, absolutely not. If I can go in and grab one thing I will. I'm a forward person. I'll tell them to get out of the way. My sisters go shopping for me. People act stupid, like they don't have no brains. Like Wal-Mart you spend an hour in line waiting to check out. I can't handle it. I go to Dollar store or Green Hills. This world is way too populated." . . .

Michelle replied about what she does in her spare time, "(I) listen to music, probably the most, watch TV, play with my daughter. We play dolls a lot. I read to her. I don't like getting out of the house. I've seen the administrative law judge in November. They said I can't work. I don't understand why I'm still seeing doctors. I would rather work. I would make more money. My anxiety is so bad, but I need help. I don't feel like it's my fault."

Michelle appears able to understand and remember most oral and written instructions. She may have a moderate degree of difficulty with more complex written instructions. She probably will have problems on some days being able to focus on tasks. She appears able to sustain concentration and persist with a task, although she probably will not be able to reliably perform a task. She was able to attend to and concentrate on the interview, which lasted approximately 1.5 hours. She was able to sit without complaint or apparent discomfort for this period of time. She did not appear to have any difficulty with gross motor functioning or coordination in walking to and from the examiner's office. She appears to have a moderate degree of difficulty with social interaction and adapting to new environments. She appears able to manage money.

Mental Status: Michelle was oriented. She was alert. She was cooperative. Her affect was flat. She cried several times when reporting her personal history. She appeared to be somewhat depressed. . . . She did not appear to be anxious. She reported a history of at least 2 anxiety attacks. . . . Her cognitive ability appeared to be low average, and her fund of knowledge appeared to be below average. . . . Her attention and concentration were good. . . .

Dr. Taylor assessed Major Depressive Disorder, recurrent moderate; Panic Disorder by history; nicotine dependence, physical abuse of a child and physical abuse of an adult. He found that she has "some schizoid features." He assessed a GAF of 60.

Prognosis: Michelle will probably not attempt to secure employment. Her depression and anxiety do not appear to be debilitating. She is not in counseling and has not had the benefit of psychotherapy. Counseling may help relieve some of her symptoms of depression and anxiety. Michelle appears to be impatient and intolerant and may not

39

complete counseling, or obtain the full benefit of counseling by participating fully. . . . She has anger, intolerance, and disdain of the general public, which limits her ability to interact socially. She also appears to have distrust of authority figures.

On January 28, 2011, Dr. Taylor completed a Medical Source Statement - Mental (Tr. at 429-431). He found that plaintiff had no restriction in her ability to understand, remember and carry out simple instructions. She had mild restriction in the ability to make judgments on simple work-related decisions. She had moderate restriction in her ability to understand, remember, and carry out complex instructions and the ability to make judgments on complex work-related decisions. He found that plaintiff would have a moderate restriction in her ability to interact appropriately with the public, supervisors, coworkers, usual work situations and changes in a work routine or setting. All of this was due to plaintiff's multiple sclerosis, depression and anxiety.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge William Horne entered his opinion on March 24, 2011 (Tr. at 19-29). Plaintiff's last insured date is June 30, 2008 (Tr. at 38).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 20).

Step two. Plaintiff suffers from the following severe impairments: multiple sclerosis; obesity; major depressive disorder, recurrent, moderate; and history of panic disorder (Tr. at 20).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 24).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work, i.e., lifting no more than 10 pounds, sitting for 6 hours per day, standing or walking 2 hours per day, needs a sit/stand option, cannot do repetitive movements of the neck or repetitive overhead reaching or lifting with the upper extremities. She can do no work above shoulder

40

level. She can occasionally bend and climb stairs. She cannot crawl, kneel, crouch or squat. She can do no lifting from floor level. She is limited to simple, routine and repetitive work in a relatively stress-free work environment with limited contact with the general public and coworkers (Tr. at 26). With this residual functional capacity, plaintiff cannot perform any of her past relevant work (Tr. at 27).

Step five. Plaintiff is capable of working as a touch-up screener, a packager, or a batcher, all of which are available in significant numbers.

## VI. BRIDGE BETWEEN EVIDENCE AND RFC

Plaintiff argues that the ALJ committed error in formulating plaintiff's residual functional capacity after having merely summarized the medical evidence and without providing a "bridge" between the evidence and the RFC by discussing how much weight he gave to each of the opinions in the record (citing SSR 96-8p). Plaintiff points out that there are only two opinions in the record (which are both consultative opinions -- Dr. Bingham (physical) and Dr. Taylor (mental).

SSR 96-8p reads in part as follows:

Symptoms. In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:
* Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;
* Include a resolution of any inconsistencies in the evidence as a whole; and
* Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. In instances in which the adjudicator has observed the individual, he or she is not free to accept or reject that individual's complaints solely on the basis of such personal observations.

Medical opinions. The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

Interestingly, in this case the psychologist who examined plaintiff at the request of Disability Determinations, Dr. Taylor, found that plaintiff's "depression and anxiety do not appear to be debilitating" and his Medical Source Statement - Mental based plaintiff's limitations on multiple sclerosis in addition to anxiety and depression. In fact, the form asks if "any other capabilities [are] affected by the impairment?" and Dr. Thomas checked "yes" and wrote "sustained physical ability due to M.S." (Tr. at 430). The doctor specializing in occupational medicine, Dr. Bingham, was asked to complete a Medical Source Statement - Physical and wrote, "I feel this examinee's primary barrier to competitive labor market is anxiety." (Tr. at 414). Therefore, both doctors who offered an opinion found that plaintiff's difficulties with employment would come from the one thing that doctor was not asked to evaluate and about which he is not a specialist.

The ALJ summarized the findings of both Dr. Taylor and Dr. Bingham, after having spent considerably more time discussing plaintiff's treatment records and her testimony:

> Other medical evidence that belies allegation of a disabling mental condition for claimant is the consultative psychological evaluation of January 20, 2011. Claimant, at that time, reported being depressed and having anxiety attacks. Dr. Taylor, the consultative psychologist, reported then that claimant denied any counseling and stated "No, I probably need some." However, she indicated that when she was at Family Guidance Center, they had wanted her to have a case manager and since she told them that she did not need a babysitter [her reference to a case manager], that mental facility had dropped her. Additionally, claimant stated that mental health sources at the above facility had advised her that everybody on Medicaid had to have a case manager.
>
> Dr. Taylor noted that claimant did not appear to be anxious, albeit she reported a history of at least two anxiety attacks. Her speech was intelligible and her responses were appropriate for content and context. Her thought process was logical and her cognitive ability appeared to be low average, with her fund of knowledge appearing to be below average. She did not exhibit any delusions or perceptual distortion and she denied auditory hallucinations. She did not report any obsessions or compulsions and she did not report any phobias. Her attention and concentration were good and her reliability and credibility appeared to be fairly good. Her insight was fair and her

42

memory not completely intact.  Her judgment did not appear to be impaired.

> Overall, Dr. Taylor assessed claimant with a major depressive disorder, recurrent, moderate, and a panic disorder, by history.  He also assessed claimant with a GAF rating of 60 at that time, which is indicative of "moderate" mental symptoms, according to the Global Assessment of Functioning ("GAF") Scale.  Dr. Taylor further noted that claimant's depression and anxiety did not appear to be debilitating. He stated that claimant was not in counseling and she had not had the benefit of psychotherapy. Dr. Taylor indicated then that counseling may help relieve some of claimant's symptoms of depression and anxiety, albeit he noted that claimant appeared to be impatient and intolerant and might not complete counseling.

(Tr. at 23-24).

> Dr. Bingham, the consultative physician, noted that claimant would be able to sit 6 of 8 hours, stand and walk 4 of 8 hours, and lift 30 pounds occasionally and 10 to 20 pounds frequently.  Pushing and pulling would be unrestricted other than that as indicated for lifting and carrying.  He further noted that due to claimant's paresthesia, claimant would be restricted from climbing ladders and balancing at unprotected heights, with no particular contra-indications to bending, stooping, kneeling, crouching or crawling.  Because of poor neck mobility, caution should be used with driving.  Additionally, Dr. Bingham stated that paresthesia might make tolerating heat, cold and vibrations difficult.

(Tr. at 25-26).

When the ALJ determined plaintiff's residual functional capacity, he indicated that she was limited to sedentary work, even though most if not all of her past work (whether substantial gainful activity or not) was at a higher exertional level (working in restaurants and nursing homes or other medical facilities).  He noted plaintiff's testimony about difficulty standing and walking:

> With respect to her own assessment of her residual functional capacity, claimant stated that she could lift 10 to 15 pounds, but not very well with the left dominant hand. She also noted that she could not walk more than 1/2 block and she could not stand for more than 10 minutes.

(Tr. at 21).

During the hearing, the ALJ described the reasons for each limitation in his hypothetical:  Because of plaintiff's history of being treated by a psychiatrist, he limited her to simple, repetitive, routine work that is "as stress-free as possible."  Because of plaintiff's

testimony about a fear of being around people, he limited her contact with the public and co-workers. Because she says MS affects her neck, he limited her to no repetitive movement of the neck. Because plaintiff testified that her MS affects her arms and shoulders, he limited her to no repetitive overhead lifting or reaching and no work above shoulder level. Because plaintiff was technically obese, he limited her to only occasional bending and stair climbing; no crawling, kneeling, crouching, squatting, or lifting from floor level; and work which would permit a sit-stand option. And finally, because hot humid weather can exacerbated symptoms of MS, he included in the hypothetical an in ability to work in hot humid conditions (Tr. at 87-90). It is clear that the ALJ's residual functional capacity for the most part came from plaintiff's own testimony. There were parts of plaintiff's testimony which the ALJ discredited; however, all of the restrictions in the RFC were made because of her own description of her limitations.

Both parties have noted that the ALJ's RFC is more restrictive than that found by either of the doctors who completed a Medical Source Statement. Clearly this is why.

Plaintiff argues, however, that the ALJ's opinion is erroneous "[f]irst, because he failed to base the RFC upon the substantial evidence of the record" and second, because he did not "provide a logical bridge between the medical evidence and the result" citing Daniel v. Massanari, 167 F. Supp. 2d 1090 (D. Neb. 2001), and Kelly v. Callahan, 133 F.3d 583 (8th Cir. 1988). Plaintiff's argument is without merit.

Daniel v. Massanari did not discuss any bridge or nexus requirement, and SSR 96-8p (quote above) does not explicitly require any such thing. In Kelly v. Callahan, the court of appeals criticized the ALJ for failing to address the opinion of a treating physician which not only corroborated the claimant's allegations but was consistent with the other evidence in the record (of which there apparently was not much, with the exception of the ignored doctor's

records). In that case the ALJ also stated that a doctor is not permitted to provide an opinion as to the number of hours a claimant can work each day, and the court of appeals pointed out that such opinions are not only permitted but encouraged. Neither of those cases support plaintiff's argument that a particular bridge or nexus is required before an ALJ has escaped a mandatory remand.

I have been unable to find any Supreme Court case, Eighth Circuit Case, or Western District of Missouri case that requires such a bridge or nexus when an ALJ assesses a claimant's residual functional capacity. Although Judge Posner, from the Seventh Circuit Court of Appeals, has been quoted by some courts in other jurisdictions with respect to such a nexus, this court is not bound by those opinions but is required to follow the case law of the Western District of Missouri, the Eighth Circuit Court of Appeals, and the Supreme Court of the United States.

The ALJ is not required to provide each limitation in the residual functional capacity assessment immediately followed by a list of the specific evidence supporting this limitation. See SSR 96-8p. Such would not only be anathema to a finding based on "all of the relevant evidence," but would result in overly lengthy decisions containing duplicative discussions of the same evidence in multiple sections. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). Such a requirement for duplicative and exacting discussion of every piece of evidence would only add further delay to the current backlog of cases awaiting decision by an ALJ, a backlog growing by the day. As the Supreme Court has stated, "[t]he disability programs administered under Titles II and XVI are of a size and extent difficult to comprehend," Heckler v. Day, 467 U.S. 104, 106 (1984), and "[t]he need for efficiency is self-evident." Barnhart v. Thomas, 540 U.S. 20, 28-29 (2003) (internal quotations omitted).

The ALJ found that plaintiff can lift no more than 10 pounds. Plaintiff testified that she

45

could lift at least 8 pounds (a gallon of milk), and later said that she could lift 10 to 15 pounds. Plaintiff has no basis for arguing with this part of the ALJ's RFC finding as it is consistent with her own testimony.

The ALJ found that plaintiff can sit for 6 hours per workday. Plaintiff testified that she could sit for an hour at a time (and that was after the ALJ reminded her she had been sitting for an hour at that point). Plaintiff refused to complete the daily activities questionnaire as requested by Disability Determinations. C. Arnold observed that plaintiff had no difficulty sitting. Dr. Bingham found that plaintiff could sit for 4 hours at a time and for 6 hours per workday. And Dr. Taylor observed that after a one and a half hour long interview, plaintiff had displayed no signs of discomfort with sitting. The evidence clearly supports the ALJ's finding with respect to sitting, and the ALJ even threw in a sit/stand option based on nothing more than plaintiff's testimony -- again, something about which she cannot now complain.

The ALJ found that plaintiff can stand or walk for 2 hours per workday. Plaintiff testified that she could stand for an hour at a time (after first testifying that she could stand for 10 minutes at the most). She said her difficulty with standing was mental, not physical. She testified she could walk a half a block due to pain; however, she was taking no pain medication. Again, she refused to provide the daily activities questionnaire to provide any other information. C. Arnold observed that plaintiff had no difficulty with standing or walking. Dr. Sharma, plaintiff's treating neurologist, observed many times that plaintiff was able to walk with good stability. Dr. Bingham found that plaintiff could stand or walk for 2 hours at a time and for 4 hours total per workday. The ALJ's finding with respect to plaintiff's ability to stand and walk is clearly supported by the credible evidence in the record.

Plaintiff testified that her MS hurts her neck, so the ALJ found that she could do no work requiring repetitive movement of the neck. This is despite the fact that x-rays of her cervical spine on November 6, 2008, were normal, and an MRI of her cervical spine on October 16, 2008, was normal. The only abnormality was found by Dr. Bingham on November 30, 2010, when he found decreased range of motion. This was an examination done in connection with plaintiff's disability application, and the range of motion measurement is determined by when a patient says a certain movement begins to hurt. Obviously the ALJ gave plaintiff the benefit of the doubt on this function.

The ALJ limited plaintiff to work requiring no repetitive overhead reaching and no work above shoulder level. The only evidence of such a limitation in this record is plaintiff's testimony that she reaches overhead only if she has to because even though she can do it, it hurts when she does. Because these restrictions are based on plaintiff's own testimony, she has no basis for challenging them.

The ALJ found that plaintiff can only occasionally bend and climb stairs. This was based on her being technically obese. Plaintiff did not testify to any problems bending, and only Dr. Bingham mentioned bending (and found that she had no problem with it); however, due to plaintiff's weight, this functional limitation was put in place. The same goes for climbing stairs, except that plaintiff herself testified that she can climb stairs and does climb them, but tries to avoid that activity because her knees crack and hurt. Therefore, the ALJ's RFC with respect to stair climbing is consistent with plaintiff's testimony.

The ALJ found that plaintiff could never crawl, kneel, crouch or squat (again due to her obesity). Plaintiff mistakenly stated (twice) in her brief that the ALJ found that plaintiff could occasionally perform these activities.

47

The ALJ found that plaintiff could perform no more than simple, repetitive, routine work in a relatively stress-free environment. This was based on plaintiff's history of anxiety, despite the fact that her anxiety had been managed conservatively with the same dose of the same medication for years, no counseling, and no psychiatric treatment other than prescription medication which had been prescribed by a nurse practitioner for the entire year before the hearing.

The ALJ limited plaintiff's contact with coworkers and the general public based on plaintiff's testimony that she does not like to be around people.

The parties agree that the ALJ's RFC is more restrictive than anything found by the doctors who saw her or reviewed her records. A review of the record shows that the greater restrictions are based on plaintiff's own subjective complaints. When an ALJ assesses a residual functional capacity in accordance with a claimant's own allegations, I fail to see how she can later claim the ALJ committed reversible error.

The RFC is a determination based upon all the record evidence. Pearsall v. Massanari, 274 F.3d 1211, 1217-1218 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)); Dykes v. Apfel, 223 F.3d 865, 866-867 (8th Cir. 2000) (citing 20 C.F.R. §§ 404.1545 and 416.945; SSR 96-8p at pp. 8-9). Although it is a medical question, the RFC findings are not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather an ALJ has the duty at step four of the sequential analysis to formulate an RFC based on all the relevant, credible evidence of record. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations); Dykes v. Apfel, 223 F.3d at 866-867 (the RFC is a determination based upon all the record evidence but the record must

48

include some medical evidence that supports the RFC finding). See also SSR 96-8p, quoted above.

I find that the RFC assessed by the ALJ in this case is based on the substantial evidence in the record and where it deviates from the findings of the doctors, it is more restrictive and is due to plaintiff's subjective complaints of her own limitations. Therefore, plaintiff's motion for judgment or remand on this basis is denied.

## VII.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony about her mental limitations was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to

49

such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.    Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> Regarding her mental condition, claimant testified that she had been in mental health treatment for her depression and anxiety for 15 years.  Symptoms included an inability to be around people or leave her home. Additionally, claimant stated that she experienced crying spells on a daily basis, albeit they did not last long.  Reference was also made to problems sleeping because of mind racing.  Although there was reference to the medical records which showed an improvement in claimant's mental condition, claimant testified that her anxiety had worsened.  When asked why she had not undergone any type of mental health counseling, claimant testified that she had tried counseling in the past, but it had not helped.  She also noted that her present psychotropic medication (Effexor) was prescribed to her by her treating family doctor. Claimant further referred to panic attacks wherein she would become sweaty and her mind would race.  Additionally, she noted that she could not sleep, eat or swallow during these panic attacks, or be around people.  Overall, she stated that that was another reason she had not gone to counseling, i.e., because of her inability to be with people.

> The Administrative Law Judge finds claimant's subjective allegations of disability not credible or supported by the totality of the evidence. . . .

> Regarding claimant's employment record, the undersigned notes that an earnings query marked as Exhibit 5D shows an inconsistent work history for claimant, with a fluctuation in reported earnings, all of which suggests that she has been out of the work force at times for reasons other than disability, thus, reflecting a poor motivation

50

to work on her part. Moreover, it is noted that claimant might have no motivation to work since she must care for a 3 year old child.

With respect to activities of daily living claimant testified that she had two children, ages 3 and 17. She noted that she took her 3 year old to the daycare center. When asked whether she was able to handle her own personal care, claimant stated that she was, except on those days when she was having a flare up of her MS or when her "nerves" were "bad." Regarding cooking, claimant testified that her sisters helped out with this. Claimant noted that she was able to wash a few dishes and do a load of laundry; however, the majority of the household chores were carried out by her 17 year old son. Claimant further testified that she was able to drive an automobile, albeit she did not like to drive because of her anxiety. She stated that she occasionally went to her son's school activities when absolutely necessary, but hated going to such events. When asked whether she went shopping, claimant replied "sometimes," depending on how she felt, and then she went only for small items.

At the consultative psychological evaluation in January 2011, claimant reported that she read the newspaper and she did some cooking "Um, when I can." She further noted that she did the laundry, with her daughter's help. When asked about shopping, claimant replied "Oh, no, absolutely not. If I can go in and grab one thing I will. I'm a forward person. I'll tell them to get out of the way." Claimant reported that her sisters shopped for her. Additionally, claimant noted that in her spare time, she listened to music, watched television, and played with her daughter.

While a claimant need not be bedridden to be found disabled, her daily activities can be seen as inconsistent with subjective symptoms precluding all types of work. The undersigned, overall, finds that claimant's activities during the period at issue do not support a finding that her symptoms would preclude all competitive employment.

The regulations state that an Administrative Law Judge may properly discount subjective complaints where there are inconsistencies in the record as a whole (20 CFR §§ 404.1529 and 416.929). Although claimant testified to some severe mental symptoms at the time of the hearing, she has had very little mental health treatment during the period at issue. Specifically, there are no records of any ongoing psychotherapy or psychiatric hospitalizations for claimant during said period. It is also noted that claimant has had very sporadic medical treatment with respect to her physical complaints. The record does not point to any frequent hospital emergency room visits or inpatient hospitalizations for claimant during the period at issue.

It is noted that there were some references by claimant at the hearing to some medical noncompliance on her part. Specifically, she testified that although her treating physician had recommended seeking help at a pain center, claimant noted that she had not yet followed through with that recommendation. Additionally, she testified that she did not want to go to mental health counseling as recommended because she would be assigned a case manager and she did not want that. Later in the hearing, claimant stated that she had not gone to any counseling because of her inability to be around people.

The record, overall, points to very sporadic medical treatment for claimant for her alleged physical and mental complaints. Additionally, although recommendations have been made to her with respect to treatment for her alleged disabling pain and mental symptoms, she has not followed through with such. The regulations specifically state that remediable impairments that persist due to failure to follow prescribed treatment generally are disfavored as a basis for "disability:" (20 CFR §§ 404.1530 and 416.930). Additionally, case law has held that the failure to follow prescribed remedial medical treatment without good cause is a basis for denying an application for benefits. Pursuant to the regulations, an impairment or combination of impairments to be disabling . . . must be established by medical evidence consisting of signs, symptoms and laboratory findings (20 CFR §§ 404.1528 and 416.928). The medical evidence must therefore be carefully considered to see if it establishes an "underlying medical condition or conditions" that substantiate claimant's complaints and or restriction from working.

With respect to claimant's mental condition, the record points to minimal mental health treatment for clamant during the period at issue. As previously noted, there is no consistent psychotherapy or psychiatric hospitalizations for claimant during said period. Moreover, the few mental health records from Family Guidance Center reflect essentially benign mental findings for clamant. Specifically, in May 2008, claimant reported doing "good" and not needing her Vistril [sic]. Claimant noted then that the Effexor was "doing good." Overall, claimant reported that she was feeling happier, and her sleep and appetite were ok. On exam, claimant was neally dressed, pleasant and cooperative. Her mood was euthymic and she reported no suicidal or homicidal ideation. The diagnosis then was of major depressive disorder.

The mental health records from Family Guidance Center through December 2008 continue to show benign mental findings for claimant. In December 2008, it was reported that claimant was doing well at that time. She reported no suicidal or homicidal ideation, no crying or anhedonia. She did report feeling anxious and occasionally had a "low" mood, but she stated that she was handling it well. The mental health visit for April 2009 again showed that claimant was "doing well." She noted that she had anxiety about her MS, but that it was controlled. Claimant was encouraged at that time to start therapy to help her with stresses.

Other medical evidence that belies allegations of a disabling mental condition for claimant is the consultative psychological evaluation of January 20, 2011. Claimant, at that time, reported being depressed and having anxiety attacks. Dr. Taylor, the consultative psychologist, reported then that claimant denied any counseling and stated "No, I probably need some." However, she indicated that when she was at Family Guidance Center, they had wanted her to have a case manager and since she told them that she did not need a babysitter, that mental facility had dropped her. Additionally, claimant stated that mental health sources at the above facility had advised her that everybody on Medicaid had to have a case manager.

The ALJ adequately discussed the <u>Polaski</u> factors and although he discredited plaintiff's

allegations of disabling pain and mental symptoms, he gave her the benefit of the doubt in

formulating her RFC as discussed above.

Plaintiff testified that she was unable to balance, that she was in constant pain, that she is unable to concentrate, and that she sleeps for hours many days each week. The medical record clearly contradicts those allegations. In September 2008 plaintiff reported no problems with balancing. In October 2008 Dr. Sharma observed that plaintiff was able to walk with good stability. Later that month, he again noted that plaintiff walked with good stability. Two days after Dr. Sharma's observation, plaintiff told Dr. Daud that she had had poor balance and had fallen. Plaintiff had not reported this to her neurologist during the two appointments she had earlier that month. Dr. Daud did not note any observations of a problem with plaintiff's balance. In January 2009 plaintiff was observed to be able to walk with good stability. In February 2009 plaintiff was noted to be able to walk normally with good stability. In November 2010, Dr. Bingham noted that plaintiff had a normal fluid gait. There is insufficient evidence of a problem with balance that would affect plaintiff's RFC any more than reflected in the ALJ's assessment.

In July 2009 plaintiff reported that her low back pain was better. Dr. Sharma indicated that conservative measures were recommended. Plaintiff never took any pain medication, she did not complain of pain to doctors who could have treated her for pain, and her excuse that she did not do so because she does not like to be on medication is implausible. The ALJ properly discounted this allegation.

In March 2010, plaintiff "denied sleep disturbances." There is no other reference to sleep in any medical record. Plaintiff's allegation that she sleeps for hours each day may be true; however, it is clearly not based on any impairment but rather based on her own choice.

Plaintiff alleges a disabling mental impairment that should have been given more weight by the ALJ. Plaintiff is not at all clear about what limitations she has due to a mental

53

impairment. In her brief she points out that she testified to crying spells, that she does not like to go out in public, that she does not like to deal with people, and that she has an anxiety disorder and Major Depressive Disorder. First, plaintiff's diagnoses of Major Depressive Disorder and anxiety disorder are not relevant -- it is the functional limitations caused by these conditions that are relevant in a disability case. The ALJ accounted for plaintiff's alleged mental limitations by restricting her to simple, routine, repetitive work in a stress-free environment and with little contact with the public and co-workers. The only thing left in plaintiff's argument is her crying spells.

In October 2007 plaintiff told her psychiatrist that she had no problems with crying. In January 2008 plaintiff told her psychiatrist that she had no problems with crying. In May 2008 plaintiff told her psychiatrist that she had no problems with crying. In August 2008 plaintiff told her psychiatrist that she had no problems with crying. In October 2008 plaintiff told her psychiatrist that she was doing well and plaintiff was observed to have a "good mood." In December 2008 plaintiff told her psychiatrist that she had no problems with crying. In January 2009 plaintiff told Dr. Sharma, a neurologist, that she was "cryful with life" but she also said that she was taking Effexor and it was helping her. In April 2009 plaintiff told her psychiatrist that she had no problems with crying. Plaintiff was noted to become tearful during her interview with Dr. Bingham in connection with her application for disability benefits.

Therefore, the record shows that although plaintiff may have cried on a few occasions over a many-year period, it was apparently not a problem for her because every time she saw her treating psychiatrist she denied having any problems with crying.

Plaintiff's argument that she did not seek mental health treatment because of her mental condition is without merit. I am familiar with the law in that regard and have seen a few of

those cases during my career.  This is not one of them.  Plaintiff did indeed seek mental health treatment, however, never beyond getting a prescription for Effexor.  The medication worked well for her.  She did not increase the dosage even when her psychiatrist told her she could.  She said it was working fine.  She did not use Vistaril as an added medication because she felt she was handling her symptoms well without it.  She did not participate in counseling.  She was routinely noted by her psychiatrist to be doing well, each mental symptom was addressed by Dr. Jaffri and plaintiff was noted to be without symptoms.  After a while plaintiff was able to get prescriptions for Effexor from her nurse practitioner, and that continued to be sufficient to take care of her Major Depressive Disorder and any anxiety disorder.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's credibility determination. The ALJ discredited plaintiff on only disabling pain, the need to sleep many hours each day during the day, and debilitating mental symptoms.  He properly did so.

## VIII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge


Kansas City, Missouri
August 19, 2013

55